UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| NICHOLAS WEBSTER YAMASAKI,<br><br>Plaintiff,<br><br>vs.<br><br>KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CIV. NO. 21-00117 LEK-KJM |
|---|---|

**ORDER DENYING PLAINTIFF'S APPEAL AND AFFIRMING THE ADMINISTRATIVE LAW JUDGE'S DECISION**

Before the Court is Plaintiff Nicholas Webster Yamasaki's ("Yamasaki") Complaint for Review of Social Security Disability Benefits Determinations ("Complaint"), filed on February 27, 2021, [dkt. no. 1,] in which he appeals Administrative Law Judge Jesse J. Pease's ("ALJ") July 22, 2020 Decision ("Appeal"). The ALJ issued the Decision after conducting a telephonic hearing on July 2, 2020. [Administrative Record Dated August 21, 2021 ("AR"), filed 10/22/21 (dkt. no. 18), at 15 (dkt. no. 18-3 at PageID #: 97).[1]] The ALJ ultimately concluded that Yamasaki was not disabled

[1] The Decision, including the Notice of Decision – Unfavorable and the List of Exhibits, is AR pages 12-32. [Dkt. no. 18-3 at PageID #: 94-114.]

under §§ 216(i) and 223(d) of the Social Security Act. [Decision, AR at 28 (dkt. no. 18-3 at PageID #: 110).]

Yamasaki's Opening Brief was filed on December 20, 2021. [Dkt. no. 20.] Defendant Kilolo Kijakazi, Acting Commissioner of Social Security ("the Commissioner"), filed the Answering Brief on February 4, 2022, and Yamasaki filed his Reply Brief on February 18, 2022. [Dkt. nos. 21, 22.] The Court heard oral argument in this matter on April 1, 2022. See Minutes, filed 4/1/22 (dkt. no. 25). For the reasons set forth below, Yamasaki's Appeal is denied.

## BACKGROUND

On November 19, 2018, Yamasaki filed a Title II application for disability insurance benefits alleging that he was disabled as of February 28, 2018. On July 8, 2019, Yamasaki filed a written request for a hearing. Yamasaki and Ronald Hatakeyama, an impartial vocational expert ("VE"), testified at the July 2, 2020 telephonic hearing. [Decision, AR at 15 (dkt. no. 18-3 at PageID #: 97).]

Yamasaki worked as a mason from 1985 to February 28, 2018. [Exh. 2E (Disability Report - Adult - Form SSA-3368), AR at 247-48 (dkt. no. 18-7 at PageID #: 333-34).] At the hearing before the ALJ, Yamasaki testified that he believes the pain he experiences started within the last year that he was working. See hrg. trans., AR at 101 (dkt. no. 18-3 at PageID #: 183).

Yamasaki stated he has not worked since February 2018. [Id. at 96-97 (dkt. no. 18-3 at PageID #: 178-79).]

In the Decision, the ALJ found that Yamasaki was insured, for purposes of the Social Security Act, through September 30, 2022. [Decision, AR at 17 (dkt. no. 18-3 at PageID #: 99).] At step one of the five-step sequential analysis to determine whether a claimant is disabled, the ALJ found that Yamasaki had not engaged in substantial gainful activity since February 28, 2018. [Id.]

At step two, the ALJ found that Yamasaki had "the following severe impairments: cognitive disorder with encephalopathy and vertigo, status-post left frontal hemorrhage; hypertension; diabetes; mild neuropathy of the feet; [and] obesity." [Id. (citing 20 C.F.R. § 404.1520(c)).] However, at step three, the ALJ found that Yamasaki did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." [Id. at 18 (dkt. no. 18-3 at PageID #: 100) (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).]

In the step four analysis, the ALJ found that Yamasaki had the residual functional capacity ("RFC")

> to perform medium work as defined in 20 CFR 404.1567(c) (*e.g.* can lift, carry, push or pull 50 pounds occasionally and 20 pounds frequently;

> stand/walk for 6 hours out of 8; sit for 6 hours out of 8), except with the following additional limitations. Claimant can perform occasional climbing stairs and ramps, but no balancing (defined as standing on one foot); can perform frequent stooping, kneeling, crouching, and crawling; is precluded from hazardous machinery or unprotected heights including no ladders, ropes, or scaffolds; can perform simple and routine work; cannot work with the public; can have frequent interaction with coworkers and supervisors; cannot work at a production-rate pace; and can perform low-stress work defined as occasional decision-making and occasional changes in work setting.

[Id. at 20 (dkt. no. 18-3 at PageID #: 102).] The ALJ found that Yamasaki's impairments could reasonably be expected to cause the symptoms Yamasaki described, but the record as a whole was not entirely consistent with Yamasaki's statements about the intensity, persistence, and limiting effects of his symptoms. [Id. at 21 (dkt. no. 18-3 at PageID #: 103).]

At the hearing, Yamasaki testified that he is "unstable," loses his balance "quite a bit," and experiences headaches, back pain, and leg pain. See hrg. trans., AR at 99 (dkt. no. 18-3 at PageID #: 181). Yamasaki also testified that his memory "comes and goes," and he experiences his worst pain "below [his] head joint," but he does not have any numbness or tingling in his body. [Id. at 101-02 (dkt. no. 18-3 at PageID #: 183-84).] Yamasaki further testified that he sometimes experiences dizziness two or three times a day and that one episode of dizziness can last an hour, although some episodes

have a shorter duration. See id. at 103 (dkt. no. 18-3 at PageID #: 185). He also stated he can walk about twenty or twenty-five minutes before he feels like he needs to rest due to back and leg pain. See id. Yamasaki testified that the most he can lift is a gallon of milk. See id. at 104 (dkt. no. 18-3 at PageID #: 186). He further stated that loud noises cause him to become frustrated, and he sometimes needs family members to help "pick the right clothes out" and "comb [his] hair." [Id. at 105 (dkt. no. 18-3 at PageID #: 187).]

The ALJ asked the VE to opine regarding two hypothetical scenarios. In the first hypothetical, the ALJ asked the VE to consider an individual with Yamasaki's RFC. See id. at 106-07 (dkt. no. 18-3 at PageID #: 188-89). The VE opined that such an individual could not perform Yamasaki's past work, but could perform work as a kitchen helper, hand packager, and a laundry laborer. See id. at 107-08 (dkt. no. 18-3 at PageID #: 189-90). In the second hypothetical, the ALJ asked the VE to consider an individual with the same capabilities as in the first hypothetical, except the second individual could only perform "at the light exertional level, which means lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently." [Id. at 108 (dkt. no. 18-3 at PageID #: 190).] The VE opined that such an individual could not perform Yamasaki's past work and there would not be any transferable

skills.  [Id.]  The ALJ noted that the individual in the second
hypothetical could not perform any additional jobs.  See id. at
109 (dkt. no. 18-3 at PageID #: 191).

Yamasaki's attorney asked the VE to opine regarding a
third hypothetical - an individual with the same capabilities as
the individual in the first hypothetical, except the third
individual would need to take "an additional one hour of
unscheduled work breaks in addition to regularly scheduled
breaks, due to dizziness, fatigue, and pain."  [Id.]  The VE
opined that such an individual could not perform any work.  [Id.
at 110 (dkt. no. 18-3 at PageID # 192).]

The ALJ found that the totality of the evidence "did
not support [Yamasaki's] allegations of significantly reduced
exertional, postural, and mental functioning."  [Decision, AR at
21 (dkt. no. 18-3 at PageID #: 103).]  The ALJ first addressed
Yamasaki's cognitive disorder, finding that diagnostic imaging
did not support Yamasaki's allegations.  The ALJ cited magnetic
resonance imaging ("MRI") of Yamasaki's brain, which showed a
"right frontal hemorrhage with 'mild' enhancement and 'mild'
surrounding FLAIR/T2 hyperintensity; 'a few small' old white
matter infarcts; and negative for acoustic neuroma."  [Id.

(quoting Exh. 1F, AR at 415 (dkt. no. 18-8 at PageID #: 502)).[2] The ALJ also relied on a March 2018 computerized tomography ("CT") scan of Yamasaki's head, a May 2018 MRI of his brain, an October 2019 CT scan of his head, and January 2020 imaging of his head and spine, which together "demonstrated that [Yamasaki] could work within the bounds of the reduction to medium exertion work, with additional limitations to account for residual symptoms and combined impairments discussed throughout." [Id. at 21-22 (dkt. no. 18-3 at PageID #: 103-04) (citation omitted).]

The ALJ cited physical exam records from March 2018, August 2018, November 2018, and December 2018, which "demonstrated that [Yamasaki's] allegations of disabling balance problems and cognitive problems as well as allegations of limitations due to pain were not as significant as alleged . . . ." [Id. at 22 (dkt. no. 18-3 at PageID #: 104).] The ALJ noted that records from 2019 "show[ed] generally stable functioning . . . with some increased agitation." [Id. at 23 (dkt. no. 18-3 at PageID #: 105).] The ALJ relied on, among other things, a February 2019 visit with David Nguyen, D.O., in which Dr. Nguyen offered to prescribe medication to Yamasaki,

[2] Exhibit 1F is medical records from Pali Momi Medical Center from March 15, 2018 to December 6, 2018. [AR at 375-435 (dkt. no. 18-8 at PageID #: 462-522).] AR page 415 is part of a Procedure Note for a March 15, 2018 MR.

but Yamasaki declined, "which suggested that his mental symptoms were not overly bothersome." [Id. (citing Exh. 3F, AR at 483-87 (dkt. no. 18-8 at PageID #: 570-74)).[3]] Moreover, the ALJ relied on an April 2019 visit with Laila Spina, Psy.D., in which "Dr. Spina observed objective findings that showed some correlation with [Yamasaki's] cognitive state, but not overly worrisome observations." [Id.] The ALJ also stated "Dr. Spina also administered 4 different standard measures of effort, none of which [Yamasaki] passed, which suggested he did not put forth best effort. Accordingly, Dr. Spina concluded that the test results, due to suboptimal effort, were 'unlikely to be an accurate representation of [Yamasaki's] true ability.'" [Id. at 23-24 (dkt. no. 18-3 at PageID #: 105-06) (quoting Exh. 4F, AR at 495 (dkt. no. 18-8 at PageID #: 582)) (citing Exh. 5F, AR at 580 (dkt. no. 18-9 at PageID #: 668)).[4]]

---

[3] Exhibit 3F is medical records from Pali Momi Medical Center from December 7, 2018 to February 20, 2019. [AR at 482-90 (dkt. no. 18-8 at PageID #: 569-77).] AR pages 483 to 487 are Dr. Nguyen's notes regarding Yamasaki's February 20, 2019 office visit.

[4] Exhibit 4F is Dr. Spina's Neuropsychological Evaluation of Yamasaki which was conducted on April 16, 2019, and the report was completed on April 24, 2019. [AR at 491-96 (dkt. no. 18-8 at PageID #: 578-83).] Exhibit 5F is medical records from Hawaii Pacific Health from October 7, 2019 to May 19, 2020. [AR at 497-717 (dkt. no. 18-9 at PageID #: 585-805).] AR page 580 is part of Dr. Nguyen's notes for Yamasaki's June 26, 2019 clinic visit.

The ALJ then found that, "[a]s for [Yamasaki's]
diabetes with mild neuropathy of the feet, the evidence showed
that the reduction to medium exertion with additional
limitations as noted fully accounted for residual effects from
these impairments." [Id. at 24 (dkt. no. 18-3 at PageID
#: 106).]  The ALJ relied on a December 2018 visit with
Dr. Nguyen where Dr. Nguyen "minimally treated" Yamasaki "and
recommended weight reduction to reduce abdominal pressure along
the lateral cutaneous nerve of the thigh and physical therapy
(PT) for leg pain." [Id. (citing Exh. 1F, AR at 376-79 (dkt.
no. 18-8 at PageID #: 463-66)).]  The ALJ highlighted that
Yamasaki declined physical therapy, "which suggested the
symptoms were not overly bothersome." [Id.]  The ALJ also found
that, although Yamasaki experienced "two exacerbating events"
related to "noncompliance with diabetic medication," "the record
demonstrated that [Yamasaki's] diabetes with mild neuropathy was
well-controlled with compliance and no further limitations than
those adopted were warranted." [Id. at 24-25 (dkt. no. 18-3 at
PageID #: 106-07).]

As to Yamasaki's hypertension, the ALJ relied on a
December 2018 visit with Joshua Tan, M.D., where "Dr. Tan noted
that [Yamasaki's] hypertension had been 'generally stable.'"
[Id. at 25 (dkt. no. 18-3 at PageID #: 107) (quoting Exh. 2F, AR

at 462 (dkt. no. 18-8 at PageID #: 549)).[5]] The ALJ stated that a January 2020 electrocardiogram ("EKG") test "described borderline with sinus tachycardia, but no further complications or special testing was noted which suggested generally asymptomatic findings." [Id. (citing Exh. 5F, AR at 620 (dkt. no. 18-9 at PageID # 708)).]

The ALJ did not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." [Id.] The ALJ found that the opinions of the state agency medical consultants, N. Shibuya, M.D., and W. Matsuno, M.D., were persuasive because they "were consistent with the evidence as a whole, especially the exertional limitations and the preclusions." [Id. at 25-26 (dkt. no. 18-3 at PageID #: 107-08).] However, the ALJ found that, in light of "later received evidence and including testimony," Yamasaki's "ongoing, though intermittent lightheadedness with some balance issues warranted limiting [Yamasaki] to occasional climbing stairs and ramps and no balancing." [Id. at 26 (dkt. no. 18-3 at PageID #: 108).] The ALJ also found the opinion of the state agency medical

[5] Exhibit 2F is medical records from Dr. Tan from July 30, 2018 to December 27, 2018. [AR at 436-81 (dkt. no. 18-8 at PageID #: 523-68).] AR page 462 is part of Dr. Tan's December 27, 2018 Progress Note.

consultant, psychologist W. Fo, Ph.D., persuasive because "it was generally consistent with the evidence." [Id.] But, the ALJ found that Yamasaki experienced more limitations than described by Dr. Fo, "given later received evidence and including testimony." [Id.]

Ultimately, the ALJ found "that the subjective medical evidence, the objective medical evidence, and the opinion evidence support the residual functional capacity adopted . . . ." [Id.] However, the ALJ found that, based on his RFC, Yamasaki was incapable of returning to his past relevant work as a mason. [Id.]

At step five, the ALJ noted that Yamasaki was in the "individual closely approaching retirement age" category on the alleged disability onset date. [Id. at 27 (dkt. no. 18-3 at PageID #: 109) (citing 20 C.F.R. § 404.1563).] Furthermore, Yamasaki has at least a high school education. [Id. (citing 20 C.F.R. § 404.1564).] The Decision does not address whether Yamasaki has transferable job skills because the ALJ found that, using the Medical-Vocational Rules framework, Yamasaki was "not disabled," irrespective of the transferable skills issue. [Id. (citing SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2).] The ALJ concluded that, based on Yamasaki's age, education, work experience, and RFC, Yamasaki could make a successful adjustment to the following jobs that exist in significant numbers in the

national economy: kitchen helper, hand packager, and laundry laborer.  [Id. at 27-28 (dkt. no. 18-3 at PageID #: 109-10).]

On August 28, 2020, Yamasaki requested review of the Decision.  [Exh. 13B, AR at 196-201 (dkt. no. 18-5 at PageID #: 280-85).]  By notice dated December 28, 2020, the Appeals Council denied Yamasaki's request for review.  [Notice of Appeals Council Action ("AC Notice"), AR at 1-4 (dkt. no. 18-3 at PageID #: 83-86).]  Thus, the ALJ's Decision constitutes the final decision of the Commissioner.  [AC Notice, AR at 1 (dkt. no. 18-3 at PageID #: 83).]

In the instant Appeal, Yamasaki asserts he is unable to work because he experiences dizziness, headaches, ringing in his ears, and back and leg pain, is sometimes unstable, has poor concentration and memory, and has poor balance.  He contends the Decision should be reversed because: the ALJ failed to consider Yamasaki's tinnitus, asymmetrical hearing loss, and bilateral occipital neuralgia at step two; the ALJ erred by discrediting Yamasaki's symptom testimony; the ALJ failed to consider his wife's third-party statements; and the ALJ should consider new evidence submitted to the Appeals Council.

## STANDARD

"A district court has jurisdiction pursuant to 42 U.S.C. § 405(g) to review final decisions of the Commissioner of Social Security."  Concannon v. Saul, Civ. No. 19-00267-ACK-RT,

2020 WL 1492623, at *2 (D. Hawai`i Mar. 27, 2020), *aff'd*, No. 20-15732, 2021 WL 2941767 (9th Cir. July 13, 2021).

**I. Review of Social Security Decisions**

The Ninth Circuit conducts a de novo review of a district court's order in a social security appeal. Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1098 (9th Cir. 2014). Thus, in reviewing the Commissioner's decision, this Court applies the same standards that the Ninth Circuit applies.

A court will only disturb the Commissioner's decision if it is not supported by substantial evidence or if it is based on legal error. Id. "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (citation and internal quotation marks omitted). In reviewing a decision by the Commissioner, a district court must consider the entire record as a whole. Id. Where the record, considered as a whole, could support either affirmance or reversal, the district court must affirm the decision. Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016). To ensure a court does not substitute its judgment for the ALJ's, it must "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" Brown-

Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (quoting Treichler, 775 F.3d at 1098).

**II. Five-Step Analysis**

The following analysis applies in cases involving review of the denial of social security disability benefits or supplemental security income benefits.[6]

> To determine whether an individual is disabled within the meaning of the Social Security Act, and therefore eligible for benefits, an ALJ follows a five-step sequential evaluation. See 20 C.F.R. § 404.1520. The burden of proof is on the claimant at steps one through four. See Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). At step one, the ALJ must determine if the claimant is presently engaged in a "substantial gainful activity," § 404.1520(a)(4)(i), defined as "work done for pay or profit that involves significant mental or physical activities," Lewis v. Apfel, 236 F.3d 503, 515 (9th Cir. 2001) (citing §§ 404.1571–404.1572, 416.971–416.975). At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe," § 404.1520(a)(4)(ii), meaning that it significantly limits the claimant's "physical or mental ability to do basic work activities," § 404.1522(a); see Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).
>
> At step three, the ALJ evaluates whether the claimant has an impairment, or combination of impairments, that meets or equals the criteria of any of the impairments listed in the "Listing of

[6] Although Title II and Title XVI of the Social Security Act are each "governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs." Ford v. Saul, 950 F.3d 1141, 1148 n.1 (9th Cir. 2020) (citations omitted). Thus, both programs are assessed under the five-step analysis in disability determinations.

Impairments" (referred to as the "listings"). See § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1 (pt. A). The listings describe impairments that are considered "to be severe enough to prevent an individual from doing any gainful activity." § 404.1525(a). Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria of that listing." § 404.1525(c)(3). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) (footnote omitted).[7] If an impairment does not meet a listing, it may nevertheless be "medically equivalent to a listed impairment" if the claimant's "symptoms, signs, and laboratory findings are at least equal in severity to" those of a listed impairment. § 404.1529(d)(3). But a claimant cannot base a claim of equivalence on symptoms alone. Even if the claimant alleges pain or other symptoms that makes the impairment more severe, the claimant's impairment does not medically equal a listed impairment unless the claimant has signs and laboratory findings that are equal in severity to those set forth in a listing. § 404.1529(d)(3). If a claimant's impairments meet or equal the criteria of a listing, the claimant is considered disabled. § 404.1520(d).

If the claimant does not meet or equal a listing, the ALJ proceeds to step four, where the ALJ assesses the claimant's residual functional capacity (RFC) to determine whether the claimant can perform past relevant work, § 404.1520(e), which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do

[7] Sullivan has been superseded by statute on other grounds. See, e.g., Kennedy v. Colvin, 738 F.3d 1172, 1174 (9th Cir. 2013).

> it," § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform past relevant work, the claimant is not disabled. § 404.1520(f).
>
> At step five, the burden shifts to the agency to prove that "the claimant can perform a significant number of other jobs in the national economy." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002). To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,4 or on the testimony of a vocational expert. Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." § 404.1560(b)(2). An ALJ may also use "other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor." Id.
>
> Throughout the five-step evaluation, the ALJ "is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

Ford v. Saul, 950 F.3d 1141, 1148–49 (9th Cir. 2020) (some alterations in Ford) (footnotes omitted).

## DISCUSSION

### I. Whether the ALJ Erred in the Step-Two Analysis

Yamasaki argues the ALJ erred at step two in the five-step sequential analysis because the ALJ failed to consider Yamasaki's tinnitus, asymmetrical hearing loss, and bilateral

occipital neuralgia. [Opening Brief at 17-18.] The Commissioner argues Yamasaki has not shown how those purported impairments imposed limitations beyond what the ALJ found. [Answering Brief at 19.]

The Ninth Circuit has stated:

> Step two is merely a threshold determination meant to screen out weak claims. Bowen v. Yuckert, 482 U.S. 137, 146-47, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). It is not meant to identify the impairments that should be taken into account when determining the RFC. In fact, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). The RFC therefore **should** be exactly the same regardless of whether certain impairments are considered "severe" or not.

Buck v. Berryhill, 869 F.3d 1040, 1048-49 (9th Cir. 2017) (alteration and emphasis in Buck). When step two is decided in the claimant's favor, "he could not possibly have been prejudiced," and "[a]ny alleged error is therefore harmless and cannot be the basis for a remand." See id. at 1049 (citation omitted).

Here, "[b]ecause step two was decided in [Yamasaki's] favor, and the ALJ went on to consider steps three through five, [Yamasaki] could not have been prejudiced by any error in the ALJ's determination as to which of [Yamasaki's] impairments are

severe." See Deckard v. Saul, Case No. 18-cv-04301-BLF, 2020 WL 1157026, at *4 (N.D. Cal. Mar. 10, 2020) (citing Buck, 869 F.3d at 1049); see also Kay N. v. Saul, Case No. 2:20-cv-04741-MAA, 2021 WL 1612088, at *3 (C.D. Cal. Apr. 26, 2021) ("As an initial matter, any alleged error by the ALJ in classifying Plaintiff's mental impairments as non-severe at step two is not the basis for reversal, because the ALJ resolved step two in Plaintiff's favor by finding that Plaintiff did have other severe impairments." (citing Buck v. Berryhill, 869 F.3d 1040, 1048-49 (9th Cir. 2017))). Thus, the ultimate issue is not whether the ALJ erred at step two, but whether the ALJ failed to consider all of Yamasaki's impairments in assessing his RFC.

**II. Whether the ALJ Failed to Consider All of Yamasaki's Impairments in Assessing his RFC**

Yamasaki argues the ALJ erred by not discussing his tinnitus, asymmetrical hearing loss, and bilateral occipital neuralgia in determining Yamasaki's RFC. [Opening Brief at 18.] "In making a determination of disability, . . . . the ALJ must consider the 'combined effect' of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003)

(citations omitted).[8] Although "[t]he ALJ is not required to discuss every piece of evidence or address every issue," the ALJ "must explain why significant probative evidence has been rejected." See Matuu v. Kijakazi, CIVIL NO. 20-00446 HG-KJM, 2021 WL 6062872, at *6 (D. Hawai`i Dec. 22, 2021) (citing Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984)); see also Howard, 341 F.3d at 1012 ("However, in interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" (some citations omitted) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998))).

**A. Yamasaki's Tinnitus and Asymmetrical Hearing Loss**

Yamasaki states he "was diagnosed with tinnitus and asymmetrical hearing loss, and throughout the record reported and was observed to have a 'ringing in his ears' which affected his sleep and caused dizziness." [Opening Brief at 18 (citations omitted).] Yamasaki cites numerous medical records that discuss Yamasaki's dizziness and tinnitus. For example, Yamasaki cites a March 7, 2018 progress note, by Heather A. Sloan, N.P., at the Hawaii Ear Clinic Inc., which stated Yamasaki experienced "dizziness upon getting up," but that the "[d]izziness lasted for 2 weeks, and stopped 2 days ago." [AR

[8] Howard has been superseded by regulation on other grounds. See Rosas v. Comm'r of Soc. Sec., 3:13-cv-2160-TC, 2014 U.S. Dist. LEXIS 167332, at *11 (D. Or. Dec. 3, 2014).

at 41 (dkt. no. 18-3 at PageID #: 123).] That record also showed that Yamasaki reported "intermittent tinnitus for months," but his "[h]earing [was] subjectively stable, [although it] can fluctuate." [Id.] Yamasaki further cites a May 7, 2018 progress note by Ms. Sloan that showed Yamasaki's ability to hear conversational voices was "mildly impaired." [AR at 50 (dkt. no. 18-3 at PageID #: 132).] Yamasaki also relies on an August 9, 2018 progress note by Dr. Nguyen, which stated that Yamasaki experienced dizziness, but it was not severe. See Exh. 1F, AR at 387 (dkt. no. 18-8 at PageID #: 474). That record did not mention tinnitus but noted that Yamasaki had "[n]ormal hearing . . . ." See id. at 388 (dkt. no. 18-8 at PageID #: 475). The other records that Yamasaki relies on are substantively similar.

Yamasaki appears to conflate his tinnitus and asymmetrical hearing loss with his dizziness. To the extent that Yamasaki's tinnitus and asymmetrical hearing loss caused his underlying problem of dizziness, the ALJ addressed Yamasaki's dizziness thoroughly. See Decision, AR at 22-23 (dkt. no. 18-3 at PageID #: 104-05). Although the ALJ did not discuss some of the causal contributors to Yamasaki's dizziness, such as his tinnitus and asymmetrical hearing loss, the ALJ considered Yamasaki's dizziness. To the extent that Yamasaki argues his tinnitus and asymmetrical hearing loss were severe

problems in addition to his dizziness such that the ALJ erred by not discussing them, his argument fails. Although Yamasaki states he "was observed to have a 'ringing in his ears,'" see Opening Brief at 18 (citation omitted), he does not articulate how such evidence was "significant probative evidence" that the ALJ needed to address, see Matuu, 2021 WL 6062872 at *6 (citation omitted). The records that Yamasaki cites do not show that Yamasaki's hearing loss was anything more than a "mild[]" impairment to his conversational voice hearing. See, e.g., AR at 50 (dkt. no. 18-3 at PageID #: 132). Indeed, the medical records undercut any argument that the evidence regarding Yamasaki's tinnitus and asymmetrical hearing loss was either "significant" or "probative." See Vincent, 739 F.2d at 1395. Accordingly, the ALJ's failure to explicitly discuss Yamasaki's tinnitus and asymmetrical hearing loss was not error.

**B. Yamasaki's Bilateral Occipital Neuralgia**

Yamasaki states that "while [his] headaches were found to be non-severe, they were associated with a diagnosis of *bilateral occipital neuralgia* that the ALJ did not mention once." [Opening Brief at 18 (emphasis in original) (citation omitted).] Yamasaki cites an October 23, 2019 progress note by Dr. Nguyen, which showed Yamasaki previously experienced headaches with "6-7/10 pain" that "last[ed] about 1 [hour]." [Exh. 5F, AR at 531 (dkt. no. 18-9 at PageID #: 619).] That

progress note also stated: Yamasaki was bothered by the headaches; he experienced improvement with a greater occipital nerve block; Nortriptyline was started to help relieve the headaches; and he experienced improvement in headache frequency — going from experiencing headaches three to four days per week to experiencing them about two days per week. See id. at 531, 534 (dkt. no. 18-9 at PageID #: 619, 622). Medical records from Hawaii Pacific Health after October 23, 2019 do not discuss Yamasaki's headaches, although on May 19, 2020 Yamasaki requested another ninety-day supply of Nortriptyline. See id. at 500 (dkt. no. 18-9 at PageID #: 588).

The ALJ found that Yamasaki's headaches were "non-severe" because they were "either resolved or were substantially ameliorated with treatment and [were] without attendant exam findings and signs correlating with any ongoing, significant functional restrictions." [Decision, AR at 17-18 (dkt. no. 18-3 at PageID #: 99-100) (citations omitted).] The evidence as a whole supports the ALJ's finding. For instance, an August 9, 2018 progress note by Dr. Nguyen showed that Yamasaki did not want a headache prophylaxis because the "[p]ain [was] not severe enough." See Exh. 1F, AR at 390 (dkt. no. 18-8 at PageID #: 477). When Yamasaki's headache pain increased, he was prescribed Nortriptyline, which improved his headache frequency. See, e.g., Exh. 5F, AR at 534 (dkt. no. 18-9 at PageID #: 622).

Although Yamasaki's headaches were "bothersome," see id., Yamasaki does not explain how his headaches affected his RFC. The evidence appears to show that, overall, Yamasaki's headaches were controlled with Tylenol and Nortriptyline, which suggests that any associated impairments were not as severe as alleged.[9] Cf. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." (citation omitted)).

Yamasaki also cites Dr. Nguyen's August 9, 2019 progress note that showed he experienced "tenderness along the [bilateral greater occipital nerve] emergence and neck." [Exh. 1F, AR at 388 (dkt. no. 18-8 at PageID#: 475).] That progress note further showed that Yamasaki had normal gait, bulk, tone, and full strength in his extremities. See id. Yamasaki does not address how the tenderness affected his RFC. Subsequent progress notes do not discuss any tenderness. See, e.g., id. at 384-87 (dkt. no. 18-8 at PageID #: 471-74 (8/14/18 progress note by Lily Gallagher, M.D.); id. at 381-84 (dkt. no. 18-8 at PageID #: 468-71) (11/8/18 progress note by

[9] Dr. Nguyen noted that it was "unclear" if Yamasaki was compliant with taking the Nortriptyline as prescribed. See Exh. 5, AR at 534 (dkt. no. 18-9 at PageID #: 622).

Dr. Nguyen); id. at 376-81 (dkt. no. 18-8 at PageID #: 463-68) (12/6/18 progress notes by Michael Lui, M.D.).

Accordingly, the medical evidence regarding Yamasaki's bilateral occipital neuralgia "was neither significant nor probative." See Vincent, 739 F.2d at 1395. Therefore, the ALJ's failure to explicitly mention Yamasaki's bilateral occipital neuralgia was not error.

## III. Whether the ALJ Erred in Discrediting Yamasaki's Testimony

Yamasaki contends that the ALJ erred in rejecting his symptom testimony. [Opening Brief at 19-21.] The Ninth Circuit has stated:

> An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter [v. Astrue], 504 F.3d [1028,] 1035-36 [(9th Cir. 2007)] (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (internal quotation marks omitted)). In this analysis, the claimant is **not** required to show "that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Nor must a claimant produce "objective medical evidence of the pain or fatigue itself, or the severity thereof." Id.
>
> If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, "the ALJ can reject the claimant's

> testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281; see also Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). This is not an easy requirement to meet: "The clear and convincing standard is the most demanding required in Social Security cases." Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002).

Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014) (emphasis and some alterations in Garrison) (footnote omitted).

Here, the ALJ found "that [Yamasaki's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Yamasaki's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported by the medical evidence as a whole . . . ." [Decision, AR at 21 (dkt. no. 18-3 at PageID #: 103).] The ALJ then found that "[t]he evidence as a whole did not support [Yamasaki's] allegations of significantly reduced exertional, postural, and mental functioning." [Id.]

**A. Diagnostic Imaging Records**

In supporting his finding, the ALJ stated that the "diagnostic imaging did not support the significant allegations" related to Yamasaki's "cognitive disorder with encephalopathy and vertigo, status-post left front hemorrhage." [Id.] The ALJ

cited a March 2018 MRI of Yamasaki's brain, which revealed "mild" results.  [Id. (citing Exh. 1F, AR at 415 (dkt. no. 18-8 at PageID #: 502)).]  The ALJ also cited to other diagnostic imaging records, such as January 2020 imaging of Yamasaki's head and spine, which were "unremarkable."  [Id.]  The ALJ concluded that the diagnostic imaging "suggested that [Yamasaki's] allegations of disabling pain were not corroborated by objective images."  [Id. at 21-22 (dkt. no. 18-3 at PageID #: 103-04).]

Yamasaki argues the ALJ erred in stating that the diagnostic imaging records were not consistent with Yamasaki's allegations because "the ALJ is not a medical expert and was unable to provide any meaningful interpretation of the [diagnostic imaging records] . . . ."  [Opening Brief at 19 (citations omitted).]  "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).  In Burch, the Ninth Circuit held that the ALJ's discrediting of the claimant's pain testimony was proper because, among other things, "[t]he ALJ considered the objective medical findings," and the ALJ found that MRI and X-rays did not corroborate the claimant's allegation regarding her severe back pain.  Id.

Here, the ALJ relied on diagnostic imaging records to discredit Yamasaki's testimony.  Although MRI and CT imaging

records of Yamasaki's head and brain are arguably more difficult to use in evaluating Yamasaki's pain testimony – as compared to in Burch, where imaging that showed mild degenerative disc disease undercut the claimant's allegations of severe lower back pain, see Burch, 400 F.3d at 681 – the ALJ did not rely solely on his own evaluation of the diagnostic imaging records. For example, two of the state agency medical consultants, Dr. Shibuya and Dr. Matsuno, considered the diagnostic imaging records and found them consistent with an RFC less limiting than the RFC provided by the ALJ. The ALJ relied on Dr. Shibuya and Dr. Matsuno's interpretations of the medical records as a whole, including the diagnostic imaging records. See Decision, AR at 25-26 (dkt. no. 18-3 at PageID #: 107-08); see also Exh. 2A, AR at 115-16 (dkt. no. 18-4 at PageID #: 198-99); Exh. 4A, AR at 127-30 (dkt. no. 18-4 at PageID #: 210-13).[10] "State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R.

[10] Exhibit 2A is the Disability Determination Explanation at the initial level ("Initial DDE"), signed by Dr. Shibuya on January 16, 2019. [AR at 113-21 (dkt. no. 18-4 at PageID #: 196-204.)] AR pages 115 to 116 is the Findings of Fact and Analysis of Evidence section of the Initial DDE. Exhibit 4A is the Disability Determination Explanation at the reconsideration level ("Reconsideration DDE"), signed by Dr. Matsuno and Dr. Fo on April 5, 2019 and May 7, 2019, respectively. [AR at 123-40 (dkt. no. 18-4 at PageID #: 206-223).] AR pages 125-30 is the Findings of Fact and Analysis of Evidence section of the Reconsideration DDE.

§ 404.1513a(b)(1). Yamasaki, however, does not argue the ALJ erred in relying on Dr. Shibuya or Dr. Matsuno's opinions. Nor does Yamasaki take issue with Dr. Shibuya or Dr. Matsuno's opinions.

In any event, the ALJ did not "merely reference[] the entire record as a reason for discrediting [Yamasaki]." See Opening Brief at 19. Rather, the ALJ pointed to specific findings in the diagnostic imaging records that showed Yamasaki's impairments were not as severe as alleged. As such, the ALJ did not err in finding that the imaging records were not wholly consistent with Yamasaki's pain testimony.

**B. Records Regarding Cognitive Complaints**

Yamasaki also argues the ALJ failed to provide clear and convincing reasons to discredit Yamasaki's allegations regarding his cognitive complaints, such as his vertigo and dizziness. [Opening Brief at 19-20.] The ALJ cited Yamasaki's physical examinations, which "documented some cognitive findings consistent with [Yamasaki's] reports, but not to the extent alleged." [Decision, AR at 22 (dkt. no. 18-3 at PageID #: 104).] The ALJ relied on an August 9, 2018 progress note regarding a visit where Dr. Nguyen evaluated Yamasaki for dizziness. See id. (citing Exh. 1F, AR at 387-90 (dkt. no. 18-8 at PageID #: 474-77)). Dr. Nguyen stated that Yamasaki's "[d]izziness [is] now more of a lightheaded sensation rather

than vertigo and seems to be provoked by sudden movements," and Yamasaki "[s]till does have some true vertigo episodes but rarer." [Exh. 1F, AR at 389 (dkt. no. 18-8 at PageID #: 476).] The ALJ also noted that "Dr. Nguyen minimally treated [Yamasaki] with suggestion to maintain blood pressure below 140/90, avoid antiplatelet, take Meclizine as needed for episodic vertigo, and avoid sudden position changes, as well as return for regular follow[-up] in 3 months." [Decision, AR at 22 (dkt. no. 18-3 at PageID #: 104) (citing Exh. 1F, AR at 388 (dkt. no. 18-8 at PageID #: 475)).]

The ALJ further cited a November 2018 progress note, where "Dr. Nguyen recorded that [Yamasaki] had a 'few episodes of lightheadedness with standing up too quickly or sudden position changes. [Yamasaki h]as tried the lightheadedness exercises which helped. No falls due to dizziness.'" [Id. (quoting Exh. 1F, AR at 381-84 (dkt. no. 18-8 at PageID #: 468-71)).] The ALJ also cited Dr. Tan's observation that Yamasaki was not experiencing: staggering, memory impairment, incoordination, disorientation, confusion, falls, altered mental status, vertigo, or transient neurological symptoms. See id. (citing Exh. 2F, AR at 462 (dkt. no. 18-8 at PageID #: 549)).[11]

[11] AR page 462 is part of Dr. Tan's Progress Note for Yamasaki's December 27, 2018 visit.

Further, the ALJ relied on medical records from 2019 to show Yamasaki experienced "generally stable functioning as before with some increased agitation."  See Decision, AR at 23 (dkt. no. 18-3 at PageID #: 105).  For example, the ALJ noted that in February 2019 Yamasaki "complained of feeling off balance with 'near falls.'"  [Id. (quoting Exh. 3F, AR at 483-87 (dkt no. 18-8 at PageID #: 570-74) (2/20/19 progress note by Dr. Nguyen)).]  But, the ALJ also noted that Yamasaki's mental status examination ("MSE") "was the same unremarkable MSE as before aside from seeming 'easily agitated today, tangential speech.'"  [Id. (quoting Exh. 3F, AR at 483-87 (dkt no. 18-8 at PageID #: 570-74)).]  The ALJ stated "Dr. Nguyen offered medication for mood but [Yamasaki] declined, which suggested that his mental symptoms were not overly bothersome."  [Id. (citing Exh. 3F, AR at 483-87 (dkt no. 18-8 at PageID #: 570-74)).]  However, the ALJ did not mention that Yamasaki requested a referral to see a psychologist or psychiatrist.  See Exh. 3F, AR at 486 (dkt no. 18-8 at PageID #: 573).  Regardless, the ALJ found that "Dr. Nguyen's physical exam further showed that [Yamasaki] could work within a medium exertion because reduction to light exertion was not warranted by the medical evidence, though his agitation did warrant the limitations that [Yamasaki] cannot work with the public but can have frequent interaction

with coworkers and supervisors." [Decision, AR at 23 (dkt. no. 18-3 at PageID #: 105).]

Moreover, the ALJ discussed test results from Dr. Spina in April 2019, where "Dr. Spina found that [Yamasaki] failed to put forth optimal effort, which she corroborated with 4 different tests to assess effort." [Id. (citing Exh. 4F, AR at 491-96 (dkt. no. 18-8 at PageID #: 578-83)).] The ALJ noted that "Dr. Spina observed objective findings that showed some correlation with [Yamasaki's] cognitive state, but not overly worrisome observations." [Id.] Although Yamasaki "scored in the low, extremely low, and borderline range" "[i]n various tests for things such as intellectual functioning, language, visual spatial skills, attention/concentration and processing speed, problem solving and reasoning," "Dr. Spina concluded that the test results, due to suboptimal effort, were 'unlikely to be an accurate representation of [Yamasaki's] true ability.'" [Id. at 23-24 (dkt. no. 18-3 at PageID #: 105-06) (some citations omitted) (quoting Exh. 4F, AR at 495 (dkt. no. 18-8 at PageID #: 582)).]

Despite Dr. Spina's reservations, the ALJ found that Dr. Spina's objective observations supported increased limitations, but not "limitations for additional breaks during the workday." [Id. at 24 (dkt. no. 18-3 at PageID #: 106).] The ALJ cited a June 2019 observation that, although Yamasaki

still reported "continued agitation and intermittent lightheadedness when standing too quickly," Yamasaki only experienced dizziness "just one or twice weekly and was prescribed [M]eclizine to take as needed for dizziness or lightheadedness." [Id. (citing Exh. 5F, AR at 580-83 (dkt. no. 18-9 at PageID #: 668-71)).[12]] An October 2019 visit showed similar observations. See id. (citing Exh. 5F, AR at 530-34 (dkt. no. 18-9 at PageID #: 618-22)).[13] Although that progress note showed Yamasaki fell three times in October, see Exh. 5F, AR at 530 (dkt. no. 18-9 at PageID #: 618), it appears the falls were from diabetic ketoacidosis that occurred in early October 2019, see id. at 535 (dkt. no. 18-9 at PageID #: 623) (10/6/19 medical record). The October 23, 2019 progress note showed that Yamasaki was not experiencing dizziness during the visit. See id. at 530 (dkt. no. 18-9 at PageID #: 618).

Yamasaki argues that the ALJ erred because he "did not explain how someone feeling off balance and having multiple 'near falls' should be lifting and carrying up to fifty pounds for one-third of their workday." [Opening Brief at 20 (citation omitted).] The ALJ noted that Yamasaki's dizziness and

---

[12] AR pages 580 to 583 are part of Dr. Nguyen's June 26, 2019 Progress Notes. See Exh. 5F, AR at 579-83 (dkt. no. 18-9 at PageID #: 667-71).

[13] AR pages 530 to 534 is part of an October 23, 2019 Progress Note by Dr. Nguyen. See Exh. 5F, AR at 530-35 (dkt. no. 18-9 at PageID #: 618-23.

lightheadedness occurred once or twice a week, and only occurred if Yamasaki stood up too quickly.  See Decision, AR at 24 (dkt. no. 18-3 at PageID #: 106).  The ALJ also cited progress notes that showed Yamasaki's dizziness and lightheadedness were controlled with exercises and medication.  See id. at 22 (dkt. no. 18-3 at PageID #: 104) (citing Exh. 1F, AR at 381-84 (dkt. no. 18-8 at PageID #: 468-71)).  Thus, the ALJ relied on objective medical evidence that undercut Yamasaki's testimony that he experienced balance issues, dizziness, and lightheadedness multiple times per day.  See, e.g., hrg. trans., AR at 103 (dkt. no. 18-3 at PageID #: 185).

        Additionally, Yamasaki argues "[t]he ALJ failed to provide any reasoning as to why someone who is 'easily agitated' with 'tangential speech' at their own doctor's office could spend two-thirds of their day working with other people." [Opening Brief at 20 (citation omitted).]  However, the ALJ relied on Dr. Spina's findings to limit Yamasaki's interactions such that he would never interact with the public but could work with coworkers and supervisors.  See Decision, AR at 24 (dkt. no. 18-3 at PageID #: 106).  Notably, when asked if he has any difficulty with getting along with people, Yamasaki testified "[n]o, not really."  [Hrg. trans., AR at 104 (dkt. no. 18-3 at PageID #: 186).]  Accordingly, the ALJ sufficiently explained

why Yamasaki's agitation level did not require more restrictive limitations.

C. **Records Regarding Yamasaki's Neuropathy**

Yamasaki takes issue with the ALJ's findings regarding the neuropathy in his feet. See Opening Brief at 20-21. Yamasaki argues the ALJ failed to give "specific reasoning . . . for discrediting [his] neuropathy in his feet and difficultly standing and walking." [Id. at 20 (citation omitted).] Yamasaki testified that he can only walk for about twenty to twenty-five minutes before needing to sit down due to back and leg pain. See hrg. trans., AR at 103 (dkt. no. 18-3 at PageID #: 185). In discrediting Yamasaki's testimony, the ALJ cited a December 6, 2018 progress note by Dr. Lui, which showed that Yamasaki had left thigh numbness and burning, and left leg pain. See Decision, AR at 18 (dkt. no. 18-3 at PageID #: 100); Exh. 1F, AR at 378 (dkt. no. 18-8 at PageID #: 465). Yamasaki also exhibited "mild length dependent sensory polyneuropathy distally in the feet which is likely related to his history of diabetes." [Id.] However, that finding was "incidental . . . and unrelated to his current symptom complaints." [Id.] The doctor further stated "[t]here [was] no active denervation seen in either leg or the thighs or a generalized motor or more proximal polyneuropathy. There [was] no evidence of a diabetic amyotrophy." [Id.] Additionally, the ALJ noted that an

electromyography ("EMG") test was "'relatively unremarkable.'"
See Decision, AR at 24 (dkt. no. 18-3 at PageID #: 106 (quoting
Exh. 1F, AR at 376-79 (dkt. no. 18-8 at PageID #: 463-66)).  The
ALJ also noted that Yamasaki was "minimally treated," and
Dr. Nguyen "recommended weight reduction to reduce abdominal
pressure along the lateral cutaneous nerve of the thigh and
physical therapy (PT) for leg pain."  [Id. (citing Exh. 1F, AR
at 376-79 (dkt. no. 18-8 at PageID #: 463-66)).]  The ALJ also
relied on a December 27, 2018 Progress Note, where Dr. Tan
stated Yamasaki "has been compliant with therapy recently" and
his "[g]lucose control is good."  [Id.; Exh. 2F, AR at 462 (dkt.
no. 18-8 at PageID #: 549).]

        The ALJ further pointed to a June 26, 2019 progress
note by Dr. Nguyen, which showed Yamasaki still experienced left
leg pain.  See Decision, AR at 24 (dkt. no. 18-3 at PageID
#: 106); Exh. 5F, AR at 579 (dkt. no. 18-9 at PageID #: 667).
But, the ALJ stated that Yamasaki "still had 5/5 strength in
both upper and lower extremities with sensory to light touch
within normal limits and normal gait."  [Decision, AR at 24
(dkt. no. 18-3 at PageID #: 106) (citing Exh. 5F, AR at 580-83
(dkt. no. 18-9 at PageID #: 668-71)).]  The ALJ noted that
Yamasaki "was again conservatively treated with advice of
regular exercise, healthy diet and weight loss, and offered, but
declined, PT referral."  [Id. (citing Exh. 5F, AR at 580-83

(dkt. no. 18-9 at PageID #: 668-71)).]  In a February 20, 2019 progress note, Dr. Nguyen stated that Yamasaki "[r]eports no one is helping him with his leg pain and headaches despite refusal of [medications] or referral to PT."  [Exh. 3F, AR at 484 (dkt. no. 18-8 at PageID #: 571).]

        "[A]n ALJ may consider in weighing a claimant's credibility . . . unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007) (citations and internal quotation marks omitted).  "[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment."  Parra, 481 F.3d at 751 (citation and internal quotation marks omitted).

        Here, the medical records show that Yamasaki was offered different treatments for his leg pain.  However, Yamasaki refused medication and physical therapy for his leg pain.  Yamasaki has not offered a reason for not seeking additional treatment that would potentially alleviate the allegedly debilitating pain associated with his neuropathy.  Moreover, the evidence shows that Yamasaki's doctors provided him with conservative treatment for his leg pain.  Accordingly, the ALJ did not err in discrediting Yamasaki's pain testimony related to his neuropathy.

**IV. Whether the ALJ Erred by Failing to Consider Mrs. Yamasaki's Third-Party Statements**

Yamasaki argues the ALJ erred because he failed to consider his wife's statements. See Opening Brief at 21-23. "To reject third-party reports of a claimant's impairments, . . . an ALJ need only 'give reasons that are germane to each witness.'" Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (some citations omitted) (quoting Molina v. Astrue, 674 F.3d 1104, 1114 (9th Cir. 2012)).[14]

Here, the ALJ cited three function reports, but did not discuss them in detail and therefore did not provide germane reasons for rejecting them. See Decision, AR at 21 (dkt. no. 18-3 at PageID #: 103) (citing Exh. 4E, AR 261-89 (dkt. no. 18-7 at PageID #: 347-75; Exh. 9E, AR at 305-12 (dkt. no. 18-7 at PageID #: 391-98); Exh. 10E, AR at 313-20 (dkt. no. 18-7 at PageID #: 399-406)).[15] But, the ALJ's failure to

[14] Molina has been superseded on other grounds by 20 C.F.R. § 404.1502(a). See, e.g., Thomas v. Saul, 830 F. App'x 196, 198 (9th Cir. 2020).

[15] Exhibit 4E is a Function Report - Adult (with supporting documents), dated December 15, 2018, which was completed by Mrs. Yamasaki on behalf of Yamasaki. [AR at 261-89 (dkt. no. 18-7 at PageID #: 347-75).] Exhibit 9E is a Function Report - Adult, dated April 17, 2019, which was completed by Mrs. Yamasaki on behalf of Yamasaki . [AR at 305-12 (dkt. no. 18-7 at PageID #: 391-98).] Exhibit 10E is a Function Report - Adult - Third Party, dated April 17, 2019, which was completed by Mrs. Yamasaki. [AR at 313-20 (dkt. no. 18-7 at PageID #: 399-406).]

address Mrs. Yamasaki's third-party statements was harmless
because the statements "did not describe any limitations beyond
those [Yamasaki] [him]self described, which the ALJ discussed at
length and rejected based on well-supported, clear and
convincing reasons."  See Molina, 674 F.3d at 1122 (footnote
omitted).  For instance, Mrs. Yamasaki's third-party Function
Report stated that: bending up and down causes Yamasaki to
experience headaches and dizziness; Yamasaki occasionally needs
help with putting long pants on; Yamasaki sometimes needs to be
reminded to comb his hair; Yamasaki does not drive; and Yamasaki
remembers to take his pills, except he forgets to take Victoza.
See Exh. 10E, AR at 313-15 (dkt. no. 18-7 at PageID #: 399-401).
Yamasaki's Function Reports are substantively similar.  See,
e.g., Exh. 4E, AR at 261-63 (dkt. no. 18-7 at PageID #: 347-49);
Exh. 9E, AR at 305-07 (dkt. no. 18-7 at PageID #: 391-93).

        The ALJ made clear findings relevant to Yamasaki's
statements that were similar, if not identical, to
Mrs. Yamasaki's statements in her third-party Function Report.
Accordingly, the ALJ's failure to explicitly address
Mrs. Yamasaki's third-party statements was harmless.

**V.   Whether Remand is Necessary Because the ALJ did not
      Consider Evidence Submitted to the Appeals Council**

        Yamasaki argues the ALJ decided the case before some
records could be obtained, and "there [was] a 'reasonable

possibility' the new evidence 'would have changed the outcome of the administrative hearing.'"  See Opening Brief at 23-24 (quoting Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001)). "[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1159-60 (9th Cir. 2012).

Yamasaki points to four records to support his argument that the evidence would have changed the outcome of the administrative hearing.  See Opening Brief at 24.  First, Yamasaki cites a March 7, 2018 record by Ms. Sloan that showed Yamasaki experienced dizziness and tinnitus.  See AR at 41-43 (dkt. no. 18-3 at PageID #: 123-25).  Yamasaki also cites a March 7, 2018 audiogram, which showed Yamasaki had "normal hearing sloping to mild to moderate [sensorineural hearing loss]" in his right ear and "normal hearing sloping to mild to [moderate-severe] [sensorineural hearing loss]" in his left ear. [AR at 52 (dkt. no. 18-3 at PageID #: 134).]  Yamasaki further cites a May 7, 2018 progress note by Ms. Sloan, which showed Yamasaki had "[i]ntermittent tinnitus." [Id. at 48 (dkt. no. 18-3 at PageID #: 130).]  However, that progress note also

showed Yamasaki had "stable" audiogram results and his "[v]ertigo [was] resolved with Meclizine and Zofran." [Id.] Finally, Yamasaki cites a June 22, 2020 report regarding a CT scan of his abdomen and pelvis that showed "[m]ild degenerative changes in the hips and [sacroiliac] joints," "[d]egenerative grade 1 anterolisthesis L4 on L5," "[b]ilateral facet arthropathy," and "[l]ate subacute L1 vertebral compression fracture with 25% anterior loss of body height." [AR at 85 (dkt. no. 18-3 at PageID #: 167).]

As to the three records concerning Yamasaki's dizziness and/or tinnitus, Yamasaki does not provide sufficient reasons why they are significant or probative. Those records do not provide information that was not already addressed in other records that the ALJ considered. Furthermore, the May 7, 2018 progress note mentioned Yamasaki's "hearing to conversational voice [was] mildly impaired." [AR at 50 (dkt. no. 18-3 at PageID #: 132).] That note also showed Yamasaki's vertigo was resolved with medication. See id. at 48 (dkt. no. 18-3 at PageID #: 130). Thus, the three records are neither substantive nor probative for the reasons already provided in the Court's analysis of Yamasaki's tinnitus and hearing loss. See *supra* Discussion Section II.A.

As to the June 22, 2020 report regarding Yamasaki's degenerative changes in the hips and lower back, Yamasaki has

not shown that the report is substantive or probative. After relying on January 2020 imaging of Yamasaki's spine, which was "unremarkable," the ALJ found that "[t]here was also no diagnostic imaging that would be consistent with [Yamasaki's] report of 20-pound lifting limitations." [Decision, AR at 21-22 (dkt. no. 18-3 at PageID #: 103-04).] The June 22, 2020 report, showing a vertebral compression fracture, could support Yamasaki's contention that he would be precluded from lifting 20 pounds frequently. But, Dr. Tan's June 29, 2020 Progress Note, which mentioned bilateral pelvic pain, showed that Yamasaki experienced "no joint pain, leg pain, back pain, neck pain, contractures, muscle pain or muscle atrophy." See AR at 67-68 (dkt. no. 18-3 at PageID #: 149-50). The objective medical evidence contradicts Yamasaki's statement that "his **back pain** was related to degenerative changes, arthropathy, and a compression fracture." See Opening Brief at 24 (emphasis added). At most, the evidence shows that Yamasaki experienced some pelvic pain, but the June 29, 2020 progress note does not show that any treatment was recommended, which casts doubts on Yamasaki's description of the severity of the pain. Moreover, Yamasaki testified that he experienced back and leg pain, but, notably, he did not mention pelvic pain. See hrg. trans., AR at 103-04 (dkt. no. 18-3 at PageID #: 185-86). Ultimately, Yamasaki fails to show how the June 22, 2020 report is

significant or probative in light of the other medical evidence. Remand to consider the additional evidence is therefore unwarranted.[16]

**CONCLUSION**

On the basis of the foregoing, Yamasaki's appeal of the Administrative Law Judge's July 22, 2020 Decision is HEREBY DENIED, and the Decision is HEREBY AFFIRMED. There being no remaining issues in this case, the Court DIRECTS the Clerk's Office to enter judgment and close the case on **June 15, 2022** unless Plaintiff filed a motion for reconsideration of this Order by **June 14, 2022.**

IT IS SO ORDERED.

---

[16] Yamasaki also asks the Court to remand under sentence six of 42 U.S.C. § 405(g). See Opening Brief at 23. However, "that standard applies only to new evidence that is not part of the administrative record and is presented in the first instance to the district court." See Brewes, 682 F.3d at 1164 (citing 42 U.S.C. § 405(g)). "[E]vidence submitted to and considered by the Appeals Council is not new but rather is part of the administrative record properly before the district court." Id. Here, the Appeals Council considered Yamasaki's proffered evidence, and therefore it is a part of the administrative record. Yamasaki appears to agree in his reply. See Reply at 12.

DATED AT HONOLULU, HAWAII, May 31, 2022.

/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**NICHOLAS WEBSTER YAMASAKI VS. KILOLO KIJAKAZI; CV 21-00117 LEK-KJM; ORDER DENYING PLAINTIFF'S APPEAL AND AFFIRMING THE ADMINISTRATIVE LAW JUDGE'S DECISION**